UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:11-cr-00009-JMS-CMM-07 |
| ) | |
| EDWARD WEATHERSPOON ) | |
| a/k/a Knucklehead, ) | |
| ) | |
| Defendant. ) | |

**Order Denying Motion for Compassionate Release**

In 2011 Edward Weatherspoon entered into a plea agreement with the United States to plead guilty to conspiracy to possess with intent to distribute and to distribute 50 grams or more of methamphetamine (actual) and 500 grams or more of methamphetamine (mixture), a violation of 21 U.S.C. §§ 841(a)(1), 846, and 851. Dkt. 343. On March 2, 2012, the Court sentenced Mr. Weatherspoon to 240 months' imprisonment. Dkt. 453. He has been in the custody of the Bureau of Prisons (BOP) since. On May 27, 2020, Mr. Weatherspoon began efforts to obtain a compassionate release from custody pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended by § 603 of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018). Dkts. 865, 867. Counsel has been appointed and a supplemental motion filed. Dkt. 872. The United States has responded in opposition, dkt. 880, and Mr. Weatherspoon has replied. Dkts. 883, 885. Two supplemental replies have been also been filed. Dkts. 888, 890. For the reasons explained below, Mr. Weatherspoon's motion to vacate the remaining portion of his imprisonment and to be placed on supervised release is **denied**.

## I. Background

As just noted, Mr. Weatherspoon pled guilty in 2012 to conspiracy to possess and distribute methamphetamine. Dkt. 433. The presentence report described Mr. Weatherspoon as a mid-level methamphetamine trafficker. Dkt. 369 at ¶ 16. He obtained the drug from an individual in the Terre Haute, Indiana, area where he and other co-conspirators distributed between 700 grams and 1.5 kilograms of actual methamphetamine, and between 5 and 15 kilograms of methamphetamine mixture. When arrested, federal agents confiscated from Mr. Weatherspoon and the other co-conspirators large quantities of methamphetamine, $30,000 in cash, and 31 firearms. *Id.* at ¶¶ 15-19.

Mr. Weatherspoon had prior criminal convictions for battery, possession of marijuana, carrying a concealed weapon, and dealing in marijuana. *Id.* at ¶¶ 40-43. The latter charge had resulted in an Indiana prison term ending on February 1, 2009, and probation ending on January 26, 2010. *Id.* at ¶ 43. When arrested on the state charge, Mr. Weatherspoon had a large amount of money on his person, and eight pounds of marijuana, three scales, two firearms, and various pills of controlled substances were found in his residence. *Id.* Mr. Weatherspoon was arrested on the federal indictment on April 27, 2011, just fifteen months after his probation on the state marijuana dealing conviction ended.

The statutory term of imprisonment for Mr. Weatherspoon's offense was 20 years to life. 21 U.S.C. §§ 841(b)(1)(A)(viii) and 851. The United States Sentencing Guidelines recommended sentence range was 168 to 210 months, less than the statutory minimum sentence, resulting in a Guideline sentence of 240 months. Dkt. 369 at ¶¶ 74-75. As noted, Mr. Weatherspoon was sentenced to statutory minimum 240 months imprisonment. Dkt. 453. A post-imprisonment term of 10 years of supervised release was also imposed. *Id.*

## II. Motion for Compassionate Release

Mr. Weatherspoon is now 45 years old and imprisoned at the Federal Correctional Institution – Elkton in Lisbon, Ohio. Dkt. 872 at ¶¶ 6-7. He has an "out-date" of May 26, 2028, and argues he has served more than half of his sentence of imprisonment. On June 1, 2020, when Mr. Weatherspoon's supplemental motion for compassionate release was filed, there were 345 Elkton inmates who had tested positive for COVID-19. Nine had died from the virus. *Id.* at 1.[1] As noted from the numbers reported in the footnote, since Mr. Weatherspoon filed his supplemental motion and the July 16, 2020, BOP data, 15 additional COVID-19 cases among inmates have been reported.

### A.  Mr. Weatherspoon's Health

In April 2020, Mr. Weatherspoon himself contracted COVID-19 at the facility, was hospitalized for two weeks, and is now recovering after his return. *Id.* at 1-2. Mr. Weatherspoon asserts that he is not receiving the recommended follow-up care which places him at risk of relapse or reinfection. He asserts that his health and life are in immediate jeopardy because of his confinement at Elkton during the COVIC-19 pandemic. *Id.*

When Mr. Weatherspoon became symptomatic with COVID-19 symptoms, prison officials waited six days to take him to a hospital. He arrived at the hospital in acute respiratory failure, right lung pneumonia, was hypoxic, and had severe sepsis. *Id.* at ¶ 8. Mr. Weatherspoon's condition was serious and required extensive intervention. When he was discharged from the hospital,

---

[1] The Bureau of Prisons reports that as of July 6, 2020, there were 360 active cases of COVID-19 among inmates at FCI Elkton, and 7 active cases among staff members. https://www.bop.gov/coronavirus/ (last visited July 6, 2020). 565 inmates and 1 staff member had recovered from the virus. *Id.* As of July 6, 2020, there were 1,865 inmates held at FCI Elkton. https://www.bop.gov/mobile/about/population_statistics.jsp#bop_pop_table (last visited July 6, 2020).

3

medical personnel there recommended he be retested for the virus. To date, he has not been re-tested. *Id.* at ¶ 9. Mr. Weatherspoon also states that he has a history of multiple brain surgeries, a pituitary tumor, a cerebrospinal fluid leak, diabetes, and obesity. Concerning his obesity, Mr. Weatherspoon contends he is 5'6" in height and weighs 350 pounds. The United States notes that nothing in the submitted medical records reflects Mr. Weatherspoon's weight. *See* dkt. 873. The presentence report prepared in 2011 reported that Mr. Weatherspoon was 5'9" in height and weighed 275 pounds. *See* dkt. 378. Both reports of height/weight suggest obesity, with a BMI of 56.5 for Mr. Weatherspoon's current assertion and a BMI of 40.6 for the height/weight reported in the presentence report. A BMI of 30 or over is considered obese, and a BMI of 40 or over considered extreme or severe obesity. *See* https://www.cdc.gov/obesity/adult/defining.html (last visited June 15, 2020). The Court therefor considers Mr. Weatherspoon to be severely obese.

  **B.** **The Elkton Facility**

Mr. Weatherspoon contends that the Elkton facility is not a "safe place" for his recovery from the virus. Not only has he *not* been retested for the COVID-19 virus, he has been placed in a dormitory where a corrections officer moves between his unit and a unit designated for inmates with COVID-19. In his close-quarters unit, 160 inmates share three urinals and showers, and they have no soap or protective clothing. Mr. Weatherspoon's follow-up medical visits, including MRIs, have been postponed or cancelled. *Id.* at ¶¶ 11-12.

  **C.** **Mr. Weatherspoon's Post-Release Plan**

Mr. Weatherspoon owns property with his mother in Terre Haute, Indiana. The residence is also occupied by his adult sister, Angela Weatherspoon. There is a separate "in-laws suite" where Mr. Weatherspoon can quarantine if necessary. His family will support him financially until he is self-sufficient. *Id.* at ¶ 14.

### D. Administrative Remedies

To exhaust his administrative remedies, Mr. Weatherspoon filed his BP-9 with the Warden on May 7, 2020. *Id.* at ¶ 16; dkt. 875. The Warden denied the request on May 11, 2020. Dkt. 875-2.

### III. Legal Standards

### A. Exhaustion of Administrative Remedies

18 U.S.C. § 3582(c) provides in relevant part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).

Mr. Weatherspoon asserts he has exhausted his administrative remedies on his request for a compassionate release. *See* Section II.D, above. The United States concurs that Mr. Weatherspoon has exhausted his administrative remedies and may proceed in this Court on his request. Dkt. 880 at 2.

### B. Substantive Legal Standards

Congress directed the United States Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In response, the Sentencing Commission promulgated a policy statement on compassionate release under § 3582(c), which is

5

contained in United States Sentencing Guidelines (U.S.S.G.) § 1B1.13 and the accompanying Application Notes. This policy statement has not yet been updated to reflect that defendants (and not just the BOP) may move for compassionate release, but courts have universally turned to U.S.S.G. § 1B1.13 to provide guidance on the "extraordinary and compelling reasons" that may warrant a sentence reduction. *E.g.*, *United States v. Casey*, 2019 WL 1987311, at *1 (W.D. Va. 2019); *United States v. Gutierrez*, 2019 WL 1472320, at *2 (D.N.M. 2019); *United States v. Overcash*, 2019 WL 1472104, at *2-3 (W.D.N.C. 2019). There is no reason to believe, moreover, that the identity of the movant (either the defendant or the BOP) should have any impact on the factors the Court should consider.

As provided in § 1B1.13, consistent with the statutory directive in § 3582(c)(1)(A), the compassionate release analysis requires several findings. First, the Court must address whether "[e]xtraordinary and compelling reasons warrant the reduction" and whether the reduction is otherwise "consistent with this policy statement." U.S.S.G. § 1B1.13(1)(A), (3). Second, the Court must determine whether Mr. Street is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Finally, the Court must consider the § 3553(a) factors, "to the extent they are applicable." U.S.S.G. § 1B1.13.

### IV. Discussion

#### A. Extraordinary and Compelling Circumstances

Subsections (A)-(C) of Application Note 1 to § 1B1.13 identify three specific "reasons" that qualify as "extraordinary and compelling" plus a "catch-all" factor: (A) terminal illness diagnoses or serious conditions from which a defendant is unlikely to recover and which "substantially diminish[]" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his

6

sentence, whichever is less; or (C) certain family circumstances. U.S.S.G. § 1B1.13, Application Note 1(A)–(C). Subsection (D) adds a catchall provision for "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in subdivisions (A) through (C)."[2] *Id.*, Application Note 1(D).

Mr. Weatherspoon does not suggest that Subsections (B) or (C) of the Application Note apply to him. Rather, the questions are whether Mr. Weatherspoon has a terminal illness diagnosis or serious conditions from which he is unlikely to recover and which substantially diminishes his capacity for self-care while in prison, or whether catchall provisions for extraordinary and compelling reasons operate to warrant Mr. Weatherspoon's release from imprisonment.

### 1. Subsection (A) – Medical Condition

There are no contentions that Mr. Weatherspoon has been diagnosed with a terminal illness. The question therefore turns on whether he has a (1) serious condition, (2) from which he is

---

[2] The catchall provision provides, "As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13, Application Note 1(D). This policy statement has not been amended since the passage of the First Step Act to reflect the fact that defendants may now file motions directly in the district court. "Accordingly, a majority of district courts have concluded that the 'old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A).'" *United States v. Rodriguez*, __ F. Supp. 3d __, 2020 WL 1627331, at *4 (E.D. Penn. 2020) (quoting *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019)) (collecting cases). Such courts conclude that they have the "discretion to assess whether [a defendant] presents 'extraordinary and compelling reasons' for his release outside of those listed in the non-exclusive criteria of subsections (A)-(C) of the old policy statement." *Rodrigues,* 2020 WL 1627331 at *6; *see also United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *4 n.5 (D. Conn. Apr. 8, 2020). Other courts have held that they must follow the policy statement as it stands and, thus, that the Director of the BOP is the ultimate arbiter of what counts as "extraordinary and compelling" under the catchall provision. *See, e.g.*, *United States v. Lynn*, 2019 WL 3805349, at *2–4 (S.D. Ala. Aug. 13, 2019). The Court need not resolve that debate, though, because Mr. Weatherspoon's motion must be denied even if the Court assumes that the policy statement is not binding and that it has the discretion to determine what constitutes an "extraordinary and compelling reason" for a sentence reduction.

unlikely to recover, and (3) that substantially diminishes his capacity for self-care while in prison. Although Mr. Weatherspoon experienced a pituitary tumor requiring brain surgery, and a cerebral spinal fluid leak also requiring surgery, there is no argument that these past medical issues have diminished his capacity for self-care. The same is true for Mr. Weatherspoon's diabetes, hypertension, partial kidney function loss, having the sickle cell trait, obesity, or having obstructive sleep apnea. Mr. Weatherspoon argues his frequent serious medical issues make him "susceptible to serious, long-lasting and life-threatening complications" from COVID-19.

There is little objective guidance on how a district court is to evaluate the degree to which a prisoner's medical conditions have substantially diminished his capacity for self-care. *See, e.g., United States v. Bellamy,* No. 15-CV-165(8) (JRT/LIB), 2019 WL 3340699, at *3 (D. Minn. July 25, 2019) (granting compassionate release to 71 year-old wheelchair bound defendant who had heart problems, and suffered from diabetic kidney disease, among other conditions); *United States v. Willis,* 382 F. Supp. 3d 1185, 1189 (D.N.M. 2019) (finding extraordinary and compelling reasons existed for wheelchair bound and blind defendant who required 24/7 care and had an estimated eighteen months to live but denying motion based on time served and severity of crime); *United States v. Gray,* 416 F. Supp. 3d 784, 789–91 (S.D. Ind. 2019) (granting compassionate release to 64-year old defendant who had been hospitalized for multiple procedures, including chemoembolization of a liver tumor); *see also White v. United States,* 378 F. Supp. 3d 784 (W.D. Mo. 2019) (denying motion based on macular degeneration and loss of vision, where defendant was capable of going about his daily activities); *United States v. Gotti,* No. 02 CR 743-07 (CM), 2020 WL 497987, at *4 (S.D.N.Y. Jan 15, 2020) (denying motion where defendant had "a history of hypothyroidism, hyperlipidemia, gout, glaucoma, left eye blindness, hypertension, ischemic cardiomyopathy, heart failure, chronic obstructive pulmonary disease, esophageal reflux, and

chronic atrial fibrillation . . . uses a pacemaker and a manual wheelchair, but is capable of self-propelling and transferring independently . . . [and] remains independent with his activities of daily living and instrumental activities of daily living").

The paucity of guidance on evaluating the degree to which serious medical conditions have substantially diminished Mr. Weatherspoon's ability to provide self-care in prison is mostly inconsequential because he has not argued that he is unable to provide self-care. Nevertheless, applying the guidance these authorities provide to Mr. Weatherspoon's arguments and medical records the Court finds no condition that alone or in combination with others that would lead it to conclude that Mr. Weatherspoon has a significantly diminished capacity for self-care during the remaining term of his imprisonment.

### 2. Subsection (D) – Other Reasons

Mr. Weatherspoon argues there extraordinary and compelling circumstances warranting compassionate release based on three factors. First, he argues that the Elkton facility has the second highest incidence of COVID-19 in the BOP system and is unable to provide a safe space and adequate medical care for its populations. Dkt. 872 at 1. Second, Mr. Weatherspoon argues that his fragile medical condition warrants a compassionate release. *Id.* at 1-2. Third, he argues that following his contraction of COVID-19, it took six days to transfer him to a hospital, and that upon his return he has not received recommended follow-up care placing him at risk for relapse or reinfection. *Id.* at 2.

In addition to these three factors, Mr. Weatherspoon also argues that his criminal offense was not a violent crime and that under present day sentencing schemes he would have received a lesser term of incarceration. *Id.* He adds that he has family support and a place to live upon release from prison and presents no danger to the community if released early. *Id.* at 5.

### a. FCI Elkton Facility

Mr. Witherspoon argues that his mere assignment by the BOP to the Elkton facility compels a compassionate release because the facility is incapable of protecting him from reinfection or relapse of COVID-19, asserting the BOP is either unable or unwilling to provide a safe environment for Elkton inmates. He refers to an action filed in the Northern District of Ohio, *Wilson v. Williams*, No. 4:20-cv-794 (N.D. Ohio April 13, 2020), on behalf of a class of Elkton inmates in which the court entered preliminary injunctive relief ordering the BOP to remove medically vulnerable inmates from Elkton by either transfer to safer facilities or home confinement. Dkt. 876 at 13 (citing dkt. 13-2 (copies of *Wilson* petition and exhibits)). Mr. Weatherspoon's implicit argument is that because another federal district court has ordered the BOP to remove vulnerable inmates from Elkton, the ruling demonstrates that Elkton is incapable of protecting the inmates from COVID-19 and this Court should grant the motion for a compassionate release.

While *Wilson* may inform this Court of the findings of another district court concerning the conditions at Elkton, it is still of little import in assessing whether Mr. Weatherspoon should receive a compassionate release. The Supreme Court stayed the Ohio district court's order, *see Williams v. Wilson*, No. 19A1047 (Sotomayor, J., in chambers June 4, 2020), pending resolution of the BOP's appeal of the order to the Sixth Circuit Court of Appeals. On review of the BOP's appeal of the preliminary injunction order, the Sixth Circuit found that the *Wilson* petitioners had not shown a likelihood of success on the merits and therefore vacated the district court's order. *Wilson v. Williams*, 2020 WL 3056217 at *12 (6th Cir. June 9, 2020). The court found that the BOP's six-phase plan to reduce the spreading of COVID-19 at Elkton was reasonable. *Id.* at 8.

This Court finds that the present conditions at FCI Elkton, on their own, do not warrant relief in the instant case. In addition, the Court notes that in the six weeks since Mr. Weatherspoon's motion was filed, only 15 additional COVID-19 cases have been reported. *See* fn. 1, above. This is some indication that the FCI Elkton's responsive measures have been at least partially successful in reducing the spread of the virus.

### b. Mr. Weatherspoon's Medical Condition

The Court addressed Mr. Weatherspoon's medical condition in Section IV.A.1 as relevant to U.S.S.G. § 1B1.13, Application Note 1, Subsection A. In addressing "catch-all" subsection D, Mr. Weatherspoon argues that his past and present medical issues demonstrate an extraordinary and compelling reason to grant his request for compassionate release. The Court disagrees.

The United States Centers for Disease Control reports that persons of any age with Type 2 diabetes mellitus and obesity are at increased risk of severe illness from COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited July 1, 2020). Persons with high blood pressure "might be at an increased risk for severe illness" should they become infected with COVID-19. *Id.* None of his other past or present medical conditions appear on the Centers for Disease Control's statement of conditions thought to increase the severity of a COVID-19 infection. *Id.*[3] The surgeries Mr. Weatherspoon needed to treat a pituitary gland tumor (in 2012), subsequent spinal fluid discharge (in 2013), and a recurrence of the tumor (2017) are previous conditions from approximately three to eight years

---

[3] Mr. Weatherspoon also argues that he is at increased risk of severe illness from COVID-19 due to his having sickle cell trait. But that is not sickle cell disease, which is one of the conditions the Centers for Disease Control reports to place a person at increased risk of severe illness. Sickle cell trait is not the disease. Rather, sickle cell trait is when a person carries a single copy of the sickle globin gene. Sickle cell disease is when a person carries two copies of the sickle globin gene. A person with sickle cell trait "rarely [has] any clinical symptoms related to the disease." National Institute of Health, https://www.nhlbi.nih.gov/ (last visited June 15, 2020).

11

ago which from the record appear to be resolved rather than on-going. *See* dkt. 873 (medical records); dkt. 888 (defendant's supplemental brief). Annual MRI examinations check for a recurrence of the tumor. *Id.* A partial loss of kidney function not requiring dialysis, partial blindness, hypertension, and obstructive sleep apnea are conditions for which Mr. Weatherspoon is currently receiving BOP treatment, and he makes no argument that treatment for these conditions is unavailable. Indeed, Mr. Weatherspoon concedes he receives a daily medication for hypertension, diabetes medication twice daily, and the use of a CPAP machine for his sleep apnea. Dkt. 876 at 9. He has tested positive for "the sickle cell trait," but there is no indication or suggestion that he has suffered sickle cell symptoms. *Id.*; *see also* fn. 3, above.

The Court finds that Mr. Weatherspoon's current medical condition, taking into consideration his age of 45 years, and that he has already contracted and recovered from COVID-19, do not present extraordinary and compelling circumstances warranting compassionate release.

### c. COVID-19 Follow-up Treatment

The third justification for compassionate release Mr. Witherspoon presents is that the Elkton facility has not followed-through with recommended treatment for his COVID-19 since his return from the hospital. He adds that the facility has cancelled his scheduled MRI examinations. But the only recommended follow-up "treatment" Mr. Weatherspoon contends has not been followed was the hospital's recommendation for additional testing. He does not assert that he is again symptomatic, or that the failure to re-test him somehow unreasonably increases his chance of being re-infected or relapsing.

Mr. Weatherspoon receives periodic MRI examinations to assess whether the pituitary tumor has returned, a possibility that Mr. Weatherspoon suggests is 16%. Dkt. 888 at n.17; *see also*

Tests for Pituitary Tumors, American Cancer Society, https://www.cancer.org/cancer/pituitary-tumors/detection-diagnosis-staging/how-diagnosed.html (last visited June 15, 2020). He argues that he has now missed three scheduled MRI examinations in the past four months, suggesting that the BOP is unable to provide him with essential medical care. Dkt. 888 at 7, citing dkt. 888-2 (BOP notice of rescheduled MRI examination). But Mr. Weatherspoon has not missed three separate MRI examinations. He has missed one, and it has been rescheduled multiple times. Rather than indicative of the BOP's inability to provide adequate medical care, the rescheduling of the examinations in light of COVID-19 actually is an indication that the BOP is attempting to reduce exposure to the virus by limiting movements and encounters with other persons.

The Court finds that the Elkton facility's failure to provide COVID-19 retesting to Mr. Witherspoon and delaying an MRI examination to test for pituitary tumor recurrence, do not present extraordinary or compelling circumstances for compassionate release.

    **D.**    **Section 3553(a) Factors**

The Court must also consider the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable to a request for compassionate release. The factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the defendant's crimes; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

The Court has considered all relevant factors and concludes there is no factor or combination of factors that warrant a compassionate release. Mr. Weatherspoon was a middle-man in a larger methamphetamine distribution operation. He conspired with others to obtain and distribute not insignificant amounts of methamphetamine. Dkt. 378 (presentence investigation report). It is Mr. Witherspoon's third felony drug offense. *Id.* Conduct that commenced the instant offense started as early as February 2010, mere days after Mr. Weatherspoon's probation ended on his state marijuana dealing conviction. *Id.* Mr. Weatherspoon is a high school graduate and attended community college for a short time and had been working on an assembly line for about one month at the time of his arrest. *Id.*

Mr. Weatherspoon was sentenced pursuant to the statutorily-provided punishment for his offense. *See* 21 U.S.C. §§ 841(b)(1)(A)(viii) & 851. The imprisonment range was a minimum of 20 years, with a maximum term of life. The Court sentenced Mr. Weatherspoon to the minimum term. By statute, probation was not available for the committed offense. *See* 18 U.S.C. §§ 3561 (a)(2) & (a)(3), and 21 U.S.C. §§ 841(b)(1)(A)(viii) & 85.  The Court perceived no need for drug or alcohol dependency treatment, and no need for vocational education or training.

Because Mr. Weatherspoon received the minimum allowed sentence for his offense, the Court discerns no issues of sentencing disparity among defendants found guilty of like conduct. Restitution is not a relevant factor.

### E.     Danger to Any Other Person or to the Community

Even if Mr. Weatherspoon had presented extraordinary and compelling reasons warranting a sentence reduction, the Court would deny compassionate release because he presents a danger to

the community. Compassionate release is appropriate only where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Section 3142(g) provides the framework the Court follows when determining whether a defendant should be detained pending trial, which is applicable to compassionate release motions:

> **(g) Factors to be considered. –** The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning –
> **(1)** the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> **(2)** the weight of the evidence against the person;
> **(3)** the history and characteristics of the person, including –
> > **(A)** the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> > **(B)** whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> **(4)** the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Mr. Weatherspoon pled guilty to a serious drug offense, admitting that the evidence against him was strong. He participated as a "middle-man" in an organization that distributed significant quantities of methamphetamine to the Terre Haute, Indiana, area. Large amounts of cash, guns, and methamphetamine was seized when Mr. Weatherspoon was arrested. Mr. Weatherspoon characterizes his crime as non-violent, but the fact that his crime was nonviolent does not mean that he did not harm the community or that he would not pose a danger if released.

15

Mr. Weatherspoon knowingly distributed large amounts of a highly-addictive drug, thereby causing harm to many families in western Indiana. The large number of firearms seized emphasizes the danger associated with his drug-dealing activities. And significantly, Mr. Weatherspoon had previously spent time in state prison for dealing marijuana, followed by a period of probation, and was arrested on his current offense mere days after completion of the state probation. The Court is not assured that Mr. Weatherspoon would not return to criminal activity if released.

The Court recognizes that Mr. Weatherspoon is obese and has Type II diabetes, but these conditions did not prevent him from dealing methamphetamine. He has suffered serious health events while incarcerated but appears to have recovered such that his health has not deteriorated significantly since his incarceration. Mr. Weatherspoon's affliction with and recovery from COVID-19 are not circumstances that would prevent him from returning to his prior criminal activity. In short, Mr. Weatherspoon's personal characteristics do not convince the Court that he is no longer a danger to the community.

Accordingly, pursuant to § 3142(g), the Court finds that Mr. Weatherspoon would pose a danger to the community if he were released, even if the Court imposed terms of supervision. Thus, the motion for compassionate release must be denied on this basis as well.

### F. Service of Sentence

Finally, Mr. Weatherspoon contends he has served more than half of his sentence, but the United States contends otherwise. Because the Court finds no compelling and extraordinary basis for granting a compassionate release, the percentage of his sentence that Mr. Weatherspoon has actually served is irrelevant.

The Court has also reviewed Mr. Weatherspoon's supplemental replies, dkts. 888 & 890, and finds no new arguments presented and no additional evidence that would change the Court's analysis of the relevant First Step factors.

## V.     Conclusion

For these reasons, Edward Weatherspoon's May 27 and May 28, 2020, motion for compassionate release pursuant to the First Step Act, dkts. [865], [867], & [872], is **denied.** This Order does not preclude Mr. Weatherspoon from filing a subsequent motion should circumstances change.

**IT IS SO ORDERED**.

Date: 7/7/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Jessie A. Cook
Law Office of Jessie A. Cook
jessieacook@icloud.com

Lara K. Langeneckert
United States Attorney's Office (Indianapolis)
lara.langeneckert@usdoj.gov

Matthew Bryce Miller
United States Attorney's Office (Evansville)
matthew.miller4@usdoj.gov

Matthias David Onderak
United States Attorney's Office – EV
Matthias.Onderak@usdoj.gov

Lauren Wheatley
United States Attorney's Office (Evansville)
Lauren.wheatley@usdoj.gov